KASEN & KASEN, P.C.
David A. Kasen, Esq.
Society Hill Office Park, Suite 3
1874 E. Marlton Pike
Cherry Hill, New Jersey 08003
Telephone: (856) 424-4144
Facsimile: (856) 424-7565
E-Mail: dkasen@kasenlaw.com
*Counsel to Debtor(s)*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | |
| In the Matter of: | : | Chapter 11 |
| | : | |
| ROBERT T. WINZINGER, INC., | : | Case No. 17-25972/KCF |
| | : | |
| Debtor(s). | : | Hearing Date: August 7, 2018 at 10 a.m. |
| | : | |
| | : | **Oral Argument Requested** |

**DEBTOR'S MOTION, PURSUANT TO 11 U.S.C. §§ 363 AND 105
AND FED. R. BANKR. P. 2002 AND 6004, FOR ENTRY OF ORDERS:
(I) AUTHORIZING THE DEBTOR TO SELL CERTAIN ESTATE PROPERTY
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES;
(II) APPROVING A "STALKING HORSE" ASSET PURCHASE AGREEMENT;
(III) APPROVING BIDDING PROCEDURES; (IV) APPROVING THE FORM,
MANNER AND SUFFICIENCY OF NOTICE OF THE BIDDING PROCEDURES;
(V) SCHEDULING AN AUCTION AND A SALE HEARING TO CONSIDER
APPROVAL OF THE HIGHEST AND BEST OFFER THEREFROM; AND
(VI) GRANTING OTHER RELATED RELIEF**

The above-captioned debtor, Robert T. Winzinger, Inc. (the "**Debtor**"), by and through its

undersigned counsel, hereby submits this motion (the "**Motion**"), pursuant to sections 363 and 105

of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 2002 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "**Federal Rules**"), for entry of Orders: (i) authorizing

the Debtor to sell certain estate property free and clear of all liens, claims and encumbrances; (ii)

approving a "stalking horse" asset purchase agreement; (iii) approving bidding procedures; (iv)

1

approving the form, manner and sufficiency of notice of the bidding procedures; (v) scheduling an

auction and a sale hearing to consider approval of the highest and best offer therefrom; and (vi)

granting other related relief.

## JURISDICTION

1.     The above-captioned court has jurisdiction over the herein Motion pursuant to 28

U.S.C. §§ 157 and 1334.

2.     This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory and procedural predicates for the relief requested herein are

Bankruptcy Code sections 363 and 105 and Federal Rules 2002 and 6004.

## PROCEDURAL AND FACTUAL BACKGROUND

5.     On August 7, 2017 (the "**Petition Date**"), the Debtor filed a voluntary petition for

relief under Chapter 11 of the Bankruptcy Code.

6.     Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtor is managing

its affairs as a debtor in possession.  As of the date hereof, no trustee, examiner or statutory

committee has been appointed in this Chapter 11 case.

**I.      The Debtor's Business Operations and Franklin Township Property**

7.     The Debtor is a recycling company that recycles construction debris and creates

crush concrete and mulch for retail sales.

8.     The Debtor's recycling operation can be broken down into two distinct sectors: (i) the wood

recycling sector; and (ii) the concrete, asphalt, brick and block recycling sector.

9.     The Debtor operates its business, in part, on certain real property that it owns, along

with and an affiliate entity, Mill Race, Inc. ("**Mill Race**"), consisting of approximately 90.43 acres

of land and improvements thereon located in Franklin Township, Gloucester County, New Jersey,

2

and designated on the municipal Tax Map of Franklin Township, New Jersey as Lots 29, 31 and

32 in Block 2103, Lots 10, 10QFarm, 11, 12, 13, 13QFarm, 14 and 14 QFarm in Block 2403, and

Lot 1 in Block 2901, together with certain easement across, under, over and through Lot 33 in

Block 2103 (collectively, the "**Franklin Township Property**").

## II.    The Debtor's Reorganization Efforts

10.    The Debtor and its advisors have evaluated the cash requirements necessary for it

to achieve confirmation of a chapter 11 plan of reorganization.  And, in furtherance of those efforts

the Debtor has determined that the best course of action would be to sell the Franklin Township

Property as well as certain personal property located thereon, while retaining its ability to continue

to operate the concrete, asphalt, brick and block recycling sector of its business.

11.    Through highly pointed marketing efforts directed to both local and national players

in the solid waste recycling industry, and after certain extensive discussions therewith, the Debtor,

Mill Race and a New Jersey corporation by the name of Britton Industries, Inc. ("**Britton**"), have

extensively negotiated and agreed upon the terms of a "stalking horse" Asset Purchase Agreement

(the "**APA**", also designated as "**Purchase and Sale Agreement**"), a copy of which is attached

hereto marked as **Exhibit A**.

12.    Britton is in the recycling business with a concentration in wood, concrete and

aggregate products.

13.    The Debtor's Franklinville property is a NJDEP licensed class B recycling center,

which when approved by the State and the County many years ago, was approved for a very high

volume of incoming raw product (raw wood, concrete, asphalt, brick and cinder block.) The Debtor

knew that others in the construction and demolition debris recycling business would find value in

the license, in the high volumes approved by the State and County; and, in the acreage amassed

3

upon which such a recycling business could operate. Therefore the Debtor developed a marketing package that offered a detailed description of the property, zoning, licenses (recycling, storm water, air, etc) and amenities (wells, electric, etc); and, that marketing package was sent to all of the company contacts who operate in recycling and construction in the Delaware Valley (both local, regional and national companies) and who might use a license such as the Debtor's and find value in it.

14.    After packages were sent to 15 likely buyers, there were follow up calls to all. Site visits were set with the 8 who showed genuine interest in buying the facility. After the site visits, an additional follow up information package was sent to a smaller group of potential buyers until further discussion narrowed it down to 5 interested, financially able contenders.  A date was set to receive bids on the facility sale. On that date three bids were received. Two bids were higher than the third; and, those two were virtually the same as one another.

15.    The Debtor met with both potential buyers; and, had numerous telephone calls with their representatives. The Debtor easily came to the conclusion that one potential buyer had clearly tendered the better offer. The better offeror was Britton.

16.    The Debtor will be filing a Chapter 11 plan in conjunction with the sale described herein. The sale will provide a major source of revenue to fund the plan. That plan will also require the payment of creditors from cash flow; and, to accomplish those payments the Debtor will need a constant and substantial cash flow for all the years of the plan. The Debtor's business is recycling aggregates and selling them to the construction and landscape industry. The Debtor must operate their aggregate recycling operation on the property of a NJDEP licensed facility to achieve a sufficient volume of material production and sales to satisfy the payments to creditors anticipated by Debtor's bankruptcy plan. Although all bidders agreed to rent Debtor a parcel of their newly

4

purchased land, only Britton as the facility buyer, agreed to refrain from doing any concrete recycling on the Franklinville property. Britton agreed not to do any concrete recycling on the remainder of the 90+ acres while the Debtor is a tenant there. Britton's non-compete offer to Debtor is monumental to making the Debtor's operation on their Franklinville leasehold strong. Britton offers Debtor no competition for Debtor's recycling operation; whereas, other potential buyers intended to recycle aggregates right next to Debtor's operation which would have a very negative impact on the sales volume for Debtor and ultimately Debtor's ability to comply with the creditor payments in the bankruptcy plan.  Moreover, Britton is offering the Debtor five (5) years free of base rent and triple net charges with the Debtor responsible only for utility charges.  This will have a significant positive impact on the Debtor's revenue and its ability to make the creditor payments under the bankruptcy plan.

17.     Clearly put, Britton intends to buy the property and hold the State license; and, they intend to make topsoil and mulch on the site. They do not intend to do what the Debtor does. The combination of a strong wood recycler coupled with Debtor, as a lessee, recycling aggregates will be a strong draw to material buyers from the construction and landscape industry thus bolstering sales for the Debtor. It is for these reasons that the Debtor finds the Britton offer to be the better offer.

## SUMMARY OF THE MATERIAL TERMS OF THE APA[1]

18.     Subject to a Court-approved auction and sale process in accordance with the proposed bidding procedures described herein,  and the  terms and conditions enumerated in the

---

[1] The foregoing is only a summary of the APA. The reader is urged to consult the APA for a complete and accurate description of its terms. Any capitalized terms used but not otherwise defined in Section III hereof shall have the meanings ascribed to them in the APA.

APA, the Debtor and Mill Race will sell the Franklin Township Property as well as certain permits,

leases, personal property and other assets specifically enumerated in Article I of the APA (together,

the "**Property**") to Britton free and clear of all liens, claims, easements, and encumbrances,

whereupon Britton will operate its business, and lease back approximately ten (10) acres of the

Franklin Township Property to the Debtor as described in paragraph 16.17 of the APA for the

Debtor to continue to operate the concrete, asphalt, brick and block recycling sector of its business.

19.    The material terms of the APA are summarized as follows:

a.    **Buyer**. Britton is the buyer.  The APA contemplates, however, that the sale is
subject to higher and better offers.

b.    **Property to be Sold**. The Property to be sold includes, but is not limited to:

i.    The Debtor and Mill Race's right, title and interest in and to the Property,
together with all easements, rights, privileges, development rights, unpaid
condemnation or other awards, and appurtenances attendant to the Property;

ii.    All of the Debtor and Mill Race's right, title and interest in and to any
improvements or betterments located on or at the Property, including
without limitation buildings, sidewalks, roads, sewer system, waste water
treatment systems, HVAC systems, plumbing, security systems, utility
lines, fire protection systems, electrical, lines, feeders, switchers and
transformers, and equipment, including but not limited to those items listed
in Exhibit A attached to the APA (collectively, the "**Improvements**");

iii.    A certain Class B Recycling Permit (the "**Recycling Permit**") to be
assigned and transferred by the Debtor and Mill Race to Britton at closing

for which the Debtor and Mill Race shall submit and obtain all necessary governmental approvals for the transfer to Britton;

iv. All transferable governmental licenses, leases, permits, approvals and certificates in effect on the closing date and used or usable in connection with the present or future use of the Property and/or the Improvements (collectively the "**Permits**"); and

v. All of the Debtor and Mill Race's right, title and interest in and to the written leases to which the Debtor and Mill Race are a party and which affect the Property (collectively, the "**Leases**"), which Leases are listed on Exhibit B attached to the APA.

c. **Purchase Price**. The purchase price is $3,900,000.00, to be paid in the manner described in the APA.

d. **Lease Back**.  Britton shall lease to the Debtor, as tenant, a portion of the Property consisting of approximately ten (10) acres of land on the terms set forth in a lease between Britton and the Debtor (the "Winzinger Lease").  Among other terms, the Winzinger Lease term will be five (5) years commencing on the Closing Date and the Debtor will have a free rent period of five (5) years commencing on the Closing Date, except that the Debtor will pay all utilities for the Leased Premises.  The Debtor will have the option to renew the Winzinger Lease for three (3) renewal terms of five (5) years each; the terms of the Winzinger Lease shall be the same during the renewal periods except that Britton and the Debtor will negotiate prior to Closing the amount of basic rent, rent escalation, and triple net charges to be paid

7

by the Debtor during the renewal periods, and the Winzinger Lease shall be triple

net to Britton commencing on the first day of the first renewal term.

e. **Non-Compete**. During the term of the Winzinger Lease, Britton and the Debtor

will comply with certain mutual non-competition provisions, which will be

mutually agreed upon and contained in the Winzinger Lease.

f. **Closing Date**. Under the APA, the closing of the sale shall take place at the offices

of Britton's counsel, Epstein Becker & Green, P.C., 150 College Road West, Suite

301, Princeton, New Jersey 08540 at a mutually agreed upon time on or before

November 1, 2018.

g. **Bankruptcy Court Matters**. The sale is subject to a Court-approved sale process,

the Debtor's consideration of higher and better competing bids, and all terms and

conditions enumerated in the APA.

h. **Break-Up Fee**.  The APA provides for the payment of a break-up fee in an amount

of $156,000.00 (the "**Break-Up Fee**"), which is equivalent to 4% of $3,900,000.00

purchase price.  There is no separate expense reimbursement provided for under the

APA. Approval of the Break-Up-Fee is an express condition to Britton's agreement

to act as the stalking horse purchaser and enter into the APA.

## PROPOSED BIDDING PROCEDURES

20.    The Debtor proposes and respectfully requests approval of the following bidding

procedures (the "**Bidding Procedures**") for higher and better competing bids to purchase the

Property to be sold under the APA:

a. The Property may be sold only to a single bidder, in a single sale for cash.  All

bidders making an offer for the Property must be willing to sign an asset purchase

agreement substantially in the same form as the APA (as made applicable to other Qualified Bidders (as defined below)), except as to the purchase price, which shall be at least in the amount set forth in subparagraph (c) below, and the Break-up Fee.

b.   The sale of the Property shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, Mill Race, their agents, or their estates, except to the extent set forth in the APA or the purchase agreement of the successful bidder.  Britton and each Qualified Bidder shall be deemed to acknowledge and represent that each has had an opportunity to conduct any and all due diligence regarding the Property before making its bid, that it has relied solely on its own independent review, investigation and/or inspection of any documents and/or the Property in making its bid, and that it did not rely on any written or oral statements, representations, promises, warranties or guarantees whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property or the completeness of any information provided in connection therewith or the sale process, except as expressly stated in these bidding procedures or (i) as to Britton, as set forth in the APA, or (ii) as to another successful bidder, as set forth in its asset purchase agreement.

c.   To bid on the Property, a bidder must deliver to Debtor's counsel by **5:00 p.m. (Eastern Standard Time) on _____ [21 days after bid procedures hearing]** (the "**Bid Deadline**"), a written irrevocable offer for the Property in the form of a signed asset purchase agreement no less favorable to the Debtor and Mill Race than the APA (as made applicable to other Qualified Bidders), including a purchase price in the amount of at least $4,106,000.00 in cash (the "**Minimum**

**Bid**") which includes the aggregate consideration provided pursuant to the APA of $3,900,000.00 *plus* the Break-up Fee of $156,000.00 *plus* an initial overbid of $50,000, and deliver an earnest money deposit to Debtor's counsel equal to twenty percent (20%) of the Minimum Auction Bid (the "**Deposit**") in the form of a certified check or wire transfer payable to the trust account of Debtor's counsel. The bid also must: (i) identify the bidder and the officer(s) or authorized agent(s) who will appear on behalf of such bidder; (ii) contain such documents and information so as to establish the bidder's financial ability to close on the sale of the Property; (iii) if the bidder is an entity created to purchase the Property, the bid also must contain such documents and information from the bidder's parent or other appropriate affiliated company so as to establish such entity's financial ability to cause the bidder to close on the sale of the Property and a written guarantee from such parent or affiliated company of the bidder's obligations in connection with any such sale; (iv) be accompanied by a blacklined version of the APA comparing its form of asset purchase agreement to the APA; and (v) the form of order the bidder would request the Debtor seek Court approval of.  For purposes of these bidding procedures, Debtor's counsel shall mean Kasen & Kasen, P.C., 1874 E. Marlton Pike, Suite 3, Cherry Hill, New Jersey 08003.

d. All bidders must be willing and able to close on the purchase of the Property at the offices of the Debtor's counsel at a mutually agreed upon time on or before November 1, 2018.

e.  No prospective purchaser will be permitted to bid unless such party has been determined to be "financially qualified." The Debtor reserves all rights with respect to such determination, except that Britton is deemed to be "financially qualified."

f.  Only those bids that meet the requirements of the preceding five (5) subparagraphs will be considered a "Qualified Bid."  The Debtor shall notify any bidder promptly upon the determination by the Debtor of whether its bid is a Qualified Bid.  Any bidder notified that its bid is a Qualified Bid will be considered a "Qualified Bidder."

g.  Prospective purchasers must complete all due diligence by the Bid Deadline.

h.  If Qualified Bids in addition to the APA are submitted by the Bid Deadline, an auction will be conducted at the offices of Debtor's counsel on _____, 2018 [7 business days after Bid Deadline], at 11:00 a.m. (EST) (the "**Auction**").

i.  Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  Britton is a Qualified Bidder, and the bid submitted by Britton under the APA is a Qualified Bid.  Before the commencement of the Auction, if any, the Debtor will select the highest or otherwise best bid to serve as the starting point for the Auction (the "**Baseline Bid**").  The Baseline Bid will be a Qualified Bid that is determined to be a higher and  better bid than that set forth in the APA and that proposes a purchase price that is at least in the amount of the Minimum Auction Bid.  The Debtor will provide Britton with a copy of all documentation evidencing any such bid on the same day any Qualified Bid is selected as the Baseline Bid.

j.  Bidding at the Auction shall start at the Baseline Bid.  At the Auction, Qualified Bidders may improve their bids in increments of $50,000.00.  Should overbidding

11

occur, Britton shall have the right, but not the obligation, to participate in the bidding pursuant to and to the fullest extent permitted by Section 363(k) of the Bankruptcy Code and to be approved as the successful bidder at the sale hearing based on any such subsequent successful overbid.  The bidding shall be continuous and competitive and shall not end until all bidders have submitted their last and best offers.  The Debtor may adopt such other rules for the bidding process at the Auction that, in their discretion, will best promote the goals of the bidding process and are not inconsistent with, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or any of the orders of the Bankruptcy Court entered in connection herewith.  Such rules will provide that, among other things: (i) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other participating Qualified Bidder; (ii) all bids will be made and received in one room, on an open basis, and all other bidders will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (iii) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction.

k. At the conclusion of the Auction, if any, the Debtor will announce the highest and best Qualified Bid (the "**Successful Bid**"), the entity making the Successful Bid (the "**Successful Bidder**"), the second highest and best bid (the "**Back-Up Bid**"), and the entity making the Back-Up Bid (the "**Back-Up Bidder**").  In determining

the Successful Bid and Back-Up Bid, the Debtor shall consider, among other things, (i) the amount of consideration to be paid, (ii) the changes to and conditions contained in the asset purchase agreement (as compared to the APA), (iii) the extent to which such changes or conditions are likely to delay closing of the sale, and the cost to the Debtor of such changes, conditions or delay, (iv) if applicable, the nature of the bidder's financing commitment, (v) the impact on the Debtor's reorganization efforts, and (vi) the bidder's ability to close a sale and the timing thereof (including the likelihood it will obtain any required regulatory approvals or licenses).  The closing on the sale of the Property to the Successful Bidder will take place at the offices of the Debtor's counsel, or at the offices of Britton's if Britton is the Successful Bidder, at a mutually agreed upon time on or before November 1, 2018.  If, for any reason, the Successful Bidder fails to consummate the purchase of the Property, the Back-Up Bidder automatically will be deemed to have submitted the highest and best bid and the Debtor shall be authorized to effect the sale, assignment and transfer of the Property to the Back-Up Bidder and the Back-Up Bidder shall be directed to purchase the Property as soon as is commercially reasonable without further order of the Bankruptcy Court; provided, however, that if Britton is the Back-Up Bidder, it may, but shall not be required, to purchase the Property if it no longer needs to complete the section 1031 exchange because it has identified another suitable replacement property or has otherwise withdrawn the funds from the qualified intermediary for some other purpose.  Debtor's counsel shall retain the Back-Up Bidder's deposit in an interest-bearing trust account

(assuming an executed W-9 form is delivered by the Back- Up Bidder to Debtor's counsel) until the sale to the Successful Bidder closes.

l.  All deposits shall be held by Debtor's counsel in an interest-bearing bank account (assuming executed W-9 forms are delivered to Debtor's counsel), with interest to accrue for the account(s) of the relevant bidder(s). Upon entry of the Sale Order, deposits shall be returned to the relevant bidder(s) except the Successful Bidder(s) and Back-Up Bidder(s).  If the sale of the Property to the Successful Bidder closes, the Successful Bidder's deposit (plus any accrued interest) shall be applied to the purchase price at closing, and the Back-Up Bidder's deposit returned to the Back-Up Bidder.  If the sale of the Property to the Successful Bidder does not close as a result of the Successful Bidder's breach or default, then, the Successful Bidder's deposit shall be forfeited to the Debtor (in addition to the Debtor reserving all other rights and remedies against the Successful Bidder), and the Back-Up Bidder's deposit (and any accrued interest) shall be applied to the Purchase Price at Closing of the Back-Up Bidder's purchase of the Property.

m.  If no higher and better bids are submitted by the Bid Deadline, the Auction will not be held, Britton will be the Successful Bidder, the APA will be the Successful Bid and the Debtor will seek approval and authority to consummate the transactions contemplated by the APA on the terms and conditions described therein.

n.  If Britton is not the Successful Bidder and the sale of the Property is consummated with another buyer, Britton shall be paid the Break-Up Fee.

o.   A BID FAILING TO COMPLY WITH THESE REQUIREMENTS WILL NOT BE CONSIDERED BY THE DEBTOR.

## PROPOSED NOTICING OF THE BIDDING PROCEDURES

21.     The Debtor proposes and respectfully requests approval of the following noticing requirements:

      a.  The Motion and conformed Bidding Procedures Order shall be served within three (3) business days of entry of the Bidding Procedures Order, via first class mail, on: (i) counsel to Britton; (ii) all potential buyers or their known counsel currently known by the Debtor or that have expressed an interest in purchasing the Property; (iii) counsel to Investors Bank; (iv) all other parties who are known to assert interests in or liens on the Property; (v) the Internal Revenue Service and applicable state and local taxing authorities; (vi) the United States Trustee for the District of New Jersey; and (vii) all other parties who have filed a Notice of Appearance and Request for Service of Papers.

      b.  Notice provided in accordance with the preceding paragraph shall be good and sufficient and no further notice of the Bidding Procedures, Auction, sale hearing or the Debtor's request for authority to sell the Property free and clear of all liens, claims and encumbrances shall be necessary.

## RELIEF REQUESTED AND BASIS THEREFOR

22.     By this Motion, the Debtor requests that, pursuant to Bankruptcy Code sections 363 and 105 and Federal Rules 2002 and 6004, the Court enter Orders: (i) authorizing the Debtor to sell the Property described herein free and clear of all liens, claims and encumbrances; (ii) approving the "stalking horse" APA described herein and attached hereto; (iii) approving the Bidding Procedures proposed herein; (iv) approving the form, manner and sufficiency of notice of

the Bidding Procedures proposed herein; (v) scheduling an auction and a sale hearing to consider

approval of the highest and best offer therefrom; and (vi) granting other related relief.

**I.     A Sale Free and Clear of All Liens, Claims and Encumbrances Should be Authorized**

23.     Chapter 11 debtors in possession have, with limited exception, "all the rights… and

powers… of a trustee serving in a case under this [Chapter 11]." 11 U.S.C. § 1107(a).

**A.     Sale of Estate Property Outside of the Ordinary Course of Business**

24.     Bankruptcy Code section 363(b) provides that "[t]he trustee, after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate…" 11 U.S.C. § 363(b)(1).

25.     Bankruptcy Code section 105(a) provides, in relevant part, that "[t]he court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title." 11 U.S.C. § 105(a).

26.     Courts within the Third Circuit have held that transactions under § 363(b) must be

supported by sound business judgment. *See e.g. In re Summit Global Logistics, Inc.*, No. No. 08-

11566, 2008 Bankr. LEXIS 896 at * 28 (Bankr. D.N.J. Mar. 26, 2008) (adopting the ruling in *In

re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *See also D'Antonio v. Bella Vista Assocs., LLC (In

re Bella Vista Assocs., LLC)*, Case No. 07-18134/JHW, Adver. No. 07-2241, 2007 Bankr. LEXIS

4348 at *39-40 (Bankr. D. N.J. Dec. 18, 2007); *In re Congoleum Corp.*, No. 03-51524, 2007 Bankr.

LEXIS 1707 at * 6 (Bankr. D. N.J. May 11, 2007).

27.     In accordance with *Lionel* and subsequent precedent within the Third Circuit, the

sound business judgment standard is comprised of four basic requirements: (1) a sound business

purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and

reasonable notice; and (4) the buyer has acted in good faith. *In re Summit Global Logistics, Inc.*,

Jointly Administered under Case No. 08-11566, 2008 Bankr. LEXIS 896 at *26-29 (Bankr. D. N.J.

March 26, 2008); *D'Antonio v. Bella Vista Assocs., LLC (In re Bella Vista Assocs., LLC)*, Case

No. 07-18134/JHW, Adver. No. 07-2241, 2007 Bankr. LEXIS 4348 at *39-40 (Bankr. D. N.J.

Dec. 18, 2007)

28.    The good faith requirement, although not expressly contained in section 363(b), has

been grafted on to the approval of sales in the Third Circuit because that requirement appears in §

363(m) governing appeals, and because of the Third Circuit's decision in *In re Abbotts Dairies.*

*In re Congoleum Corp.*, No. 03-51524, 2007 Bankr. LEXIS 1707 at * 6 (Bankr. D. N.J. May 11,

2007).  The *Abbotts Dairies* court held that when a bankruptcy court authorizes a sale of assets

pursuant to § 363(b)(1), it is required to make a finding with respect to the good faith of the

purchaser.  *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).

29.    Although neither the Bankruptcy Code nor the Federal Rules of Bankruptcy

Procedure define 'good faith,' courts applying § 363(m) have held that the phrase encompasses

one who purchases in 'good faith' and for 'value.'  *Id.*

> "The requirement that a purchaser act in good faith . . . speaks to the
>
> integrity of his conduct in the course of the sale proceedings.
>
> Typically, the misconduct that would destroy a purchaser's good
>
> faith status at a judicial sale involves fraud, collusion between the
>
> purchaser and other bidders or the trustee, or an attempt to take
>
> grossly unfair advantage of other bidders." *In re Rock Indus. Mach.*
>
> *Corp.*, 572 F.2d at 1198; *see also Taylor v. Lake (In re Cada Invs.)*,
>
> 664 F.2d 1158, 1162 (9th Cir. 1981) ("Courts have generally
>
> appeared willing to set aside confirmed sales that were 'tinged with

fraud, error or similar defects which would in equity affect the

validity of any private transaction.'").

*Id.* at 147-148.

30.    Moreover, with respect to 'value,' "[t]raditionally, courts have held that fair and

valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised

value of the assets." *Id.* at 149 (internal quotations and citations omitted).

31.    Here, a sale of the Property in accordance with the APA and above-enumerated

Bidding Procedures satisfies the sound business judgment test and is in the best interests of the

Debtor and its estate.

32.    First, such a sale will produce significant monies that will aid in the Debtor's

reorganization efforts to satisfy, in full, the Investors Bank Mortgage encumbering the Property to

be sold, and will assist the Debtor in its efforts to pay its creditors.  Moreover, absent a sale of the

Property, whether to the Britton or another Successful Bidder, it is possible that the Debtor might

be forced to cease operations.  And, accordingly, if the Debtor was forced to liquidate, employees

of the Debtor will lose their jobs, businesses will not have the Debtor as a customer from which to

generate revenue or a vendor which supplies them with critical services, and Investors Bank, the

Debtor's first-lien lender, might incur significantly greater losses if they had to liquidate their

collateral in a disorderly, piecemeal fashion.  To the contrary, a sale of the Property affords the

Debtor the opportunity to stay in business, preserve jobs and for significant liabilities to be satisfied

at closing.

33.    Second, the Debtor and Mill Race ardently negotiated the terms of the APA with

Britton and their respective advisors, and the Debtor believes that a $3,900,000.00 purchase price

represents reasonably equivalent value and fair consideration for the Property.  Moreover, the

reasonableness of such offer will be tested in accordance with the Bidding Procedures and noticing/marketing efforts to be undertaken by the Debtor.  Indeed, the Debtor has proposed Bidding Procedures and noticing/marketing efforts specifically designed to maximize the purchase price for the Property.  For example, the Bidding Procedures do not include an expense reimbursement provision in favor of the stalking horse bidder and contain a modest Break-Up Fee of 4%, and the noticing proposed by the Debtor will ensure that any and all interested parties will receive adequate notice of the Auction to allow for a competitive sale process.  The Debtor is hopeful that, as a result of the foregoing, other interested parties will be encouraged to submit bids, attend the Auction and generate a spirited bidding process.

34.    Third, to the Debtor's knowledge, the stalking horse bidder, Britton, has at all relevant times acted in good faith.  Specifically, to the Debtor's knowledge, Britton has not engaged in any type fraud or collusion that would affect the validity of the sale proposed herein.

35.    For all of these reasons, the Debtor respectfully submits that a sale of the Property in accordance with the APA and above-enumerated Bidding Procedures is supported by sound business judgment and is in the best interests of the Debtor and its estate.  Accordingly, the Debtor requests approval of such sale, pursuant to Bankruptcy Code sections 363(b) and 105(a).

**B.    Sale of Estate Property Free and Clear of Liens and Encumbrances**

36.    Bankruptcy Code section 363(f) provides that:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

19

(2)      such entity consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest in in bona fide dispute; or

(5)      such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.      The five conditions enumerated in 11 U.S.C. § 363(f) are disjunctive and, as such, a sale thereunder can be authorized with the satisfaction of any one of the five conditions. *See Folger Adam Sec. Inc. v. De Matties/McGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000) (explaining that property may be sold free and clear if "any one of [the] five prescribed claims is met"); *See also D'Antonio v. Bella Vista Assocs., LLC (In re Bella Vista Assocs., LLC)*, Case No. 07-18134/JHW, Adv. No. 07-2241, 2007 Bankr. LEXIS 4348 at *11 (Bankr. D. N.J. Dec. 18, 2007).

38.      Notably, failure to file a timely objection after receiving notice of a proposed sale is deemed to be consent for purposes of section 363 of the Bankruptcy Code. *See e.g. In re Congoleum Corp*., No. 03-51524, 2007 Bankr. LEXIS 1707 at *1 (Bankr. D.N.J. May 11, 2007) (finding that "failure to object to a notice of sale free and clear is deemed consent to the sale for purposes of § 363(f)(2)"); *Hargrave v. Pemberton (In re Tabore, Inc.)*, 175 B.R. 855 (Bankr. D.N.J. 1994) (same); *Prime Healthcare Servs., Inc. v. Hudson Hosp. Propco, Inc. (In re Christ Hosp.)*, 2014 U.S. Dist. LEXIS 128409 at*36-37 (D.N.J. Sept. 12, 2014) (same).

39.     Also notably, the term "any interest," as used in Section 363(f), is not defined in the Bankruptcy Code.  The Third Circuit Court of Appeals specifically addressed the scope of the term "any interest" in *Folger Adam Security v. DeMatteis/MacGregor*, and observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards a "broader interpretation which includes other obligations that may flow from ownership of the property."  *Folger Adam Security v. DeMatteis/MacGregor, JV, 209 F.3d 252, 258 (3d Cir. 2000).*  In turn, the Folger Adam Court cited with approval the Fourth Circuit's ruling in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 58 1-82 (4th Cir. 1996) for the proposition that debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam Security v. DeMatteis/MacGregor*, JV, 209 F.3d 252, 258 (3d Cir. 2000).

40.     Moreover, section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); *In re Trans World Airlines. Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("Bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear [pursuant to § 105] even in the absence of § 363(f).").

41.     Here, a sale of the Property free and clear of all liens, claims and encumbrances should be approved under Bankruptcy Code section(s) 363(f).  Indeed, Investors Bank could be compelled to accept monetary satisfaction of its interest in the Property through a state court foreclosure proceeding or a chapter 7 liquidation proceeding.  And, because there is sufficient value in the Property to satisfy Investors Bank in full, the Debtor anticipates obtaining the consent

necessary in order for the Court to approve a sale of the Property free and clear of all liens, claims and encumbrances, pursuant to 11 U.S.C. § 363(f)(2).

42.     Accordingly, the Debtor submits that the Court should approve a sale of the Property free and clear of all liens, claims and encumbrances.

**II.     The APA and Proposed Bidding Procedures Should be Approved**

43.     The Debtor requests that the Court approve: (i) the APA to serve as the basis for the Debtor's solicitation of higher and better bids for the sale of the Debtor's Property; and (ii) the Bidding Procedures proposed herein, including the Break-Up Fee, which will govern the process that will allow for the ultimate consummation of such sale.

44.     Britton has engaged in arms' length and good faith negotiations with the Debtor and Mill Race, and has expended, and likely will continue to expend, considerable time and resources pursuing the purchase of the Property.  To compensate Britton for serving as a stalking horse whose bid will be subject to higher and better offers, the Debtor seeks authority to provide Britton with the bidding protections set forth herein and in the APA.  Among other things, the Debtor seeks authority to pay Britton the Break-Up Fee if the Debtor enters into a binding asset purchase agreement with a third party, obtains Court approval of such agreement, and consummates such sale.

45.     Approval of forms of bidding protections in connection with a sale of estate assets pursuant to Bankruptcy Code section 363 is frequently granted.  And, Bankruptcy Courts regularly authorize bidding incentives under the "business judgment rule" which, essentially, prohibits judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of sound business judgment. *See, e.g., In re 995 Fifth Avenue Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y 1989) (bidding incentive may be "legitimately necessary to

convince a white knight to enter the bidding by providing some form of compensation for the risk it is undertaking") (citations omitted); *In re Integrated Resources, Inc.*, 135 B.R. 746 (Bankr.S.D.N.Y.), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992).

46.    The United States Court of Appeals for the Third Circuit established standards for determining the appropriateness of bidding incentives in the bankruptcy context in *Calpine Corporation v. O'Brien Environmental Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).  In *O'Brien*, the Third Circuit held that although bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in Bankruptcy Code section 503(b) govern in the bankruptcy context. Therefore, to be approved, a debtor must demonstrate that the bidding incentives provide a benefit to its estate. *Id.* at 533.

47.    *O'Brien* identified at least two scenarios where bidding incentives may provide a benefit to the estate and thus should be authorized.  First, a benefit may be established if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives attracts a bidder to analyze the value of the assets and to submit a bid that provides a minimum or floor bid on which other bidders can rely, the "bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

48.    Here, the Break-Up Fee satisfies both the historical "business judgment rule" and the Third Circuit's "administrative expense" standard.   In that regard, it was an essential inducement and a condition to Britton's obligations under the APA and its willingness to serve as a "stalking horse" bidder that the Break-Up Fee and other Bidding Procedures be approved by the Court.  Britton has put forth considerable time and resources to negotiate the APA, which will

serve as a minimum bid on which other potential bidders can present higher and better offers, thereby increasing the likelihood that the price ultimately obtained will reflect the assets' true value. Finally, the Break-Up Fee will be paid only from the sale proceeds actually received by the Debtor from the closing of a higher and better transaction.

49. The Debtor believes the Bidding Procedures are reasonable and appropriate in light of the size and nature of the proposed sale and the resources that have been committed by Britton, have been negotiated by the parties at arms' length and in good faith, and are necessary to induce Britton to continue to pursue the purchase of the Property and be bound by the APA.

50. Absent authorization of the payment of the Break-Up fee, the Debtor might lose the opportunity to obtain the highest and best available offer for the Property and the downside protection that will be afforded by the APA. Britton has provided a material benefit to the Debtor and its creditors by increasing the likelihood that the Debtor will receive the greatest value for the Property. Furthermore, approval of the bidding procedures, including the Break-Up Fee, is required under the APA as a condition to Britton's obligation to proceed with the transaction as contemplated in the APA. *See In re Reliant Energy Channelview, L.P.,* 594 F.3d 200 (3d Cir. 2010).

51. For all of these reasons, the Debtor respectfully submits that the Break-Up Fee is fair and reasonable under the circumstances, is supported by the Debtor's business judgment and meet the standards outlined by the Third Circuit in *O'Brien*.

**III.    The Proposed Noticing of the Bidding Procedures Should be Approved**

52. The Debtor requests that the Court approve the form and manner of the notice of the Bidding Procedures proposed herein, and submits that such notice is sufficient under the circumstances.

**IV.     Scheduling the Auction and Sale Hearing**

53.      The Debtor requests that the Court schedule: (i) the Auction, if any, to take place

at the offices of Debtor's counsel at 11:00 a.m. (EST) 7 business days after the Bid Deadline; and

(ii) a sale hearing to consider approval of the highest and/or best offer therefrom to take place no

later than seven (7) business days thereafter.

**V.     Relief Under Bankruptcy Rule 6004(h)**

54.      Pursuant to Fed. R. Bankr. P. 6004(h), unless the Court orders otherwise, all orders

authorizing the sale of property pursuant to Bankruptcy Code section 363 are automatically stayed

for fourteen (14) days after entry of the order. The purpose of Rule 6004(h) is to provide sufficient

time for an objecting party to request a stay pending appeal before the order can be implemented.

55.      The fourteen (14) day period may be eliminated to allow a sale or transaction to

close immediately, particularly where there have been no objections to the sale.  The Debtor

respectfully submits that waiver of the fourteen (14) day period is appropriate here.  Time is of the

essence to complete a sale of the Property in accordance with APA.

<u>**WAIVER OF MEMORANDUM OF LAW**</u>

56.      The Debtor submits that this Motion does not present novel issues of law requiring

the citation to any authority other than the authority cited herein, and accordingly, respectfully

request that the Court waive the requirement contained in Local Rule 9013-1 that a separate

memorandum of law be submitted.

57.      The Debtor reserves its right, however, to submit a memorandum of law with

respect to this Motion in the event that opposition is received.

## **CONCLUSION**

In accordance with the foregoing, the Debtor respectfully requests entry of Orders granting the relief requested herein and such other and further relief as this Bankruptcy Court deems just and proper.

Dated:  July 11, 2018                                                KASEN & KASEN, P.C.

                                                                                       */s/ David A. Kasen*
                                                                                       David A. Kasen, Esq.
                                                                                       Society Hill Office Park, Suite 3
                                                                                       1874 E. Marlton Pike
                                                                                       Cherry Hill, New Jersey 08003
                                                                                       Telephone: (856) 424-4144
                                                                                       Facsimile: (856) 424-7565
                                                                                       E-Mail: dkasen@kasenlaw.com